# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE

Assigned on Briefs February 13, 2013

## ELGENE PORTER v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Rutherford County**
**No. F-66693     Don R. Ash, Judge**

---

**No. M2012-01139-CCA-R3-PC - Filed March 26, 2013**

---

Elgene Porter ("the Petitioner") was convicted by a jury of conspiracy to commit aggravated burglary, aggravated burglary, attempted aggravated robbery, aggravated rape, and two counts of aggravated kidnapping. The trial court sentenced the Petitioner as a Range I, violent offender to an effective sentence of forty-two years' incarceration at 100%. The Petitioner subsequently filed for post-conviction relief, which the post-conviction court denied following an evidentiary hearing. The Petitioner now appeals, arguing that he received ineffective assistance of counsel. Upon our thorough review of the record and the applicable law, we affirm the judgment of the post-conviction court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment
### of the Circuit Court Affirmed

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Ben E. Bennett, Murfreesboro, Tennessee, for the appellant, Elgene Porter.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; William Whitesell, District Attorney General; and J. Paul Newman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

The Rutherford County Grand Jury indicted the Petitioner and his brother ("the co-defendant") of conspiracy to commit aggravated burglary, aggravated burglary, aggravated robbery, aggravated rape, cruelty to animals, and two counts of aggravated kidnapping. Following a jury trial, the Petitioner received convictions for conspiracy to commit

aggravated burglary, aggravated burglary, attempted aggravated robbery, aggravated rape, and two counts of aggravated kidnapping. The trial court sentenced the Petitioner to an effective term of forty-two years at 100% for these crimes. This Court affirmed the Petitioner's convictions and sentences on direct appeal. See State v. Elgene Porter aka "Twin", No. M2009-02443-CCA-R3-CD, 2011 WL 915673, at *15 (Tenn. Crim. App. Mar. 14, 2011), perm. app. denied (Tenn. May 25, 2011). To assist in the resolution of this proceeding, we repeat here the summary of the facts set forth in this Court's opinion resolving the Petitioner's direct appeal:

At trial, the State presented the victim as its first witness. On the evening of November 21, 2006, the victim and her two-year-old daughter (the "child victim") were at their home in Smyrna. Neither the victim's two stepsons nor her husband, a professional gambler, were at home that evening. Her husband had gone to play poker. After a routine evening, she and the child victim went to sleep in the victim's bed; between 1:30 and 2:00 a.m., she heard her small terrier barking. Believing it was her husband returning home, she got up out of bed, turned on the television so the barking would not wake the child victim, and then went to the bedroom door to let the dog out.

When she opened the door, she saw three men standing at the door pointing guns at her. According to the victim, two of three men were approximately the same height, and they were all wearing dark colored clothes, dark "hoodies," long-sleeved dark shirts, dark (black or navy) ski-masks, and basic wool, work gloves. The men pushed her to the floor in the doorway of her bedroom, and one man bound her feet, wrists, and mouth with duct-tape. The dog kept barking loudly, and another man began to beat the dog. Almost immediately, the men began demanding money. Although the men were mostly covered by their clothing, the victim was able to see that two of the assailants were dark-skinned and that the other assailant was lighter-skinned.

After beating the dog until he went "limp," one of the men carried the dog out of the room by the "nape of his neck[.]" One of the men placed pillows around the child victim on the bed in order to create "an enclosure" for her. The men continued to demand money, and two of the men began ransacking the house looking for money, while the other (a dark-skinned man) stayed and guarded the victim at gunpoint. While guarding the victim, the man fondled her, inserted his gloved finger into her vagina, ordered her to perform oral sex, and put his penis inside her vagina. He then placed the victim up on the bed with her daughter, who had begun to cry, and ordered her to use a vibrator on herself. As the men were leaving, they took a jar of money

(containing approximately $50) and the victim's cell phone.[1] They told the victim, "We're going another route. We're going to find your husband." The victim estimated that the ordeal lasted from one and one-half to two hours.

After the men left and some time had passed, the victim freed herself from the duct-tape, fled the residence with her daughter and dog, and went directly to the police station. At the police station, the victim detailed the incident to Officer James Ridley of the Smyrna Police Department, who prepared a report. The victim was transferred to Stonecrest Medical Center where a rape kit examination was performed. Other than the color of their skin and the clothing they were wearing, the victim could not identify her assailants.

Detective Dustin Fait, also with the Smyrna Police Department, was called in as the crime scene investigator. He first went to the hospital, where he spoke with the victim, took some photographs of her, and collected the remaining duct-tape off her person. Detective Fait left the hospital and went to the victim's residence to collect additional evidence. Once there, he located some clothing (two ski-masks and one jacket) on a nearby street. The initial jacket and ski-mask were found very close to one another; the additional ski-mask was found a little further down the road. Inside the house, Det. Fait also found additional pieces of duct-tape, a vibrator, and pillows arranged on the bed in a "border of some sort." Detective Fait found a safe that had been opened and two jewelry boxes that had been pillaged. Detective Fait lifted some latent fingerprints from several locations in the house; however, to Det. Fait's knowledge, no fingerprints were identifiable.

After the [Petitioner] was developed as a suspect in the home invasion, he was interviewed by Det. Peach and Det. Liehr. An edited version of the videotape was played for the jury. After initially denying any involvement in the crime, the [Petitioner] stated that he was recruited to commit the robbery by a Laotian man named "Salon Von." During the interview, the [Petitioner] admitted that he went inside the victim's house and that he fondled the victim's breasts and inserted his finger into her vagina. The [Petitioner] also made a written statement detailing his participation in the home invasion. Both the videotaped and written statements were entered into evidence.

---

[1] She found her cell phone under the couch about three months later, but the jar of money was never recovered.

-3-

The rape exam did not reveal the presence of any sperm or semen. However, the Tennessee Bureau of Investigation's crime laboratory did match the DNA profile collected from a ski-mask at the crime scene to swabs collected from the [Petitioner] and [the co-defendant] (who, because they are twins, have identical DNA).

(Footnote in original).

At the post-conviction hearing, the Petitioner testified that he never discussed consecutive sentencing with his attorney at trial ("trial counsel"). Had he discussed the possibility of consecutive sentencing, it might have impacted his decision to accept or reject the State's twenty-three-year plea offer. He could not state definitely, however, that such knowledge of consecutive sentencing would have caused him to accept the State's offer. He maintained that, even though he was present at the scene of the incident, he was not guilty. Additionally, the Petitioner denied that trial counsel explained to him that he might be required to serve his sentence at 100%. He estimated that he met with trial counsel approximately three or four times. He denied that trial counsel discussed the fact that, if he were to be convicted of these indicted offenses, he would be required to register with the sex offender registry and would be on lifetime community supervision. The Petitioner stated that, prior to the charges related to this case, he had a conviction for automobile burglary.

The Petitioner remembered discussing with trial counsel the videotape of the Petitioner's statement to police. According to the Petitioner, trial counsel was going to allow the Petitioner to view the video, but the Petitioner never saw it until trial. Trial counsel told him "he didn't have the correct means to play the videotape," so the Petitioner never saw it prior to trial. The Petitioner believed this videotape was instrumental to his conviction. On cross-examination, the Petitioner denied that the trial court viewed the videotape at the suppression hearing. The State asked the Petitioner, "Now, on the videotape you did admit to inserting your finger inside of the victim; is that correct?" The Petitioner stated that he was referring to a different case in the video. He acknowledged that the statement he wrote and signed for the police was true. On redirect examination, the Petitioner insisted that it was the redacted version of the videotape that he did not have the opportunity to view prior to trial.

The Petitioner denied that trial counsel discussed with him the elements of the offenses for which he was charged. However, on cross-examination, the Petitioner admitted that trial counsel explained to him what the State would have to prove. Regarding "alibi witnesses," he remembered giving trial counsel "a couple" names, but trial counsel did not call witnesses to testify for the defense at trial. The Petitioner specified that the alibi witnesses were his mother and brother, Taneisha Robinson and Davon Dodd. On cross-examination, however, he acknowledged stating on the video statement that both of these

individuals were in the vehicle outside the house where the incident occurred. The Petitioner explained that these witnesses would have testified to the following:

> As far as Taneisha, hers was like to the fact to where what she did and did not say to the detectives. . . . And Davon Dodd was going to be the witness on the clothes and the Sketcher shoes that the person had on, that the woman said who did this to her had on.

The State questioned the Petitioner regarding his assertion that these witnesses were "alibi witnesses." The Petitioner admitted to being present at the Smyrna residence when this incident occurred.

The Petitioner stated that, prior to trial, he never had heard of Josh Blackner[2] or seen his statement. Although trial counsel filed a motion to suppress the Petitioner's statement, the Petitioner denied that trial counsel discussed this motion with him. The Petitioner made available to trial counsel his academic record because of his learning disability as well as the names of people who could discuss it, but to his knowledge trial counsel never spoke with such persons. He completed the twelfth grade and was enrolled in special education classes.

The Petitioner denied that trial counsel ever discussed with him a cigar found at the crime scene. On cross-examination, however, he could not explain the cigar's significance as to the case or this proceeding. He remembered that DNA evidence was presented at trial but never discussed the admissibility of such evidence with trial counsel prior to trial. He was unaware until after his conviction of other DNA evidence of which trial counsel was aware. The Petitioner recalled trial counsel filing a motion for new trial but did not know at what point trial counsel became aware of this DNA evidence. He denied discussing anything with trial counsel related to his motion for new trial.

On cross-examination, the Petitioner acknowledged that he was wearing a toboggan at the scene, but he did not believe the toboggan to be "good evidence" because the toboggan revealed the DNA of either the Petitioner or the co-defendant, given that they were twins. The Petitioner believed that a specialist could have analyzed the DNA to discern whose DNA was on the toboggan. He relayed the information about this specialist to trial counsel, but he stated that trial counsel did nothing with this information. As a result of all these deficiencies on the part of trial counsel, the Petitioner believed that his trial was "negatively impacted."

---

[2] At the post-conviction hearing, post-conviction counsel refers to this individual as Josh Blackner. However, on appeal, the Petitioner refers to this potential witness as Josh Blattner.

The State called trial counsel to testify. He estimated that he had represented criminal defendants in approximately one hundred trials throughout his career. When he began representing the Petitioner, he was aware that the Petitioner had charges pending not only in this case but also in Murfreesboro. Therefore, he discussed with the Petitioner the possibility of consecutive sentencing and the minimum and maximum sentences he could receive. Trial counsel also explained to the Petitioner the types of crimes for which he was indicted and that some of the crimes carried a required service at 100%. He told the Petitioner, however, that the Petitioner might be able to obtain credit up to 15% such that it was possible for the Petitioner to serve at 85%. He remembered meeting with the Petitioner on "several occasions." Trial counsel could not say with "100 percent certainty" that he informed the Petitioner about the lifetime sex offender registry or community supervision for life. He believed that he probably would have discussed it with the Petitioner when explaining the aggravated rape charge.

Regarding the Petitioner's videotaped statement, trial counsel remembered showing the Petitioner the tape using a laptop computer. Before meeting with the Petitioner, trial counsel reviewed the videotape to note items of concern for discussion, such as the Petitioner's "admission that he had actually performed a digital penetration of the victim." He also was concerned particularly with the Petitioner's indication that the "victim derived some sort of pleasure from that." Trial counsel could not recall whether the redacted version of the tape was played at the suppression hearing. He confirmed that he was aware that the videotape was redacted and noted that the redaction was at his request in order to remove references to the Petitioner's prior offenses. Trial counsel believed the videotaped statement to be "a crucial part of the case," which was why he sought to have it suppressed. He recalled telling the Petitioner, however, that suppressing the video would be difficult "because the officers conducted it in such a friendly manner."

Trial counsel testified that he reviewed with the Petitioner the charges for which the Petitioner was indicted. As to alibi witnesses, trial counsel stated that the Petitioner did not give him the name of Taneisha Robinson until trial. He recalled that the victim already "had testified that the person who had forced her to perform oral sex on him had on a pair of gray sweat pants." When trial counsel spoke with Robinson, Robinson informed trial counsel that she had seen the Petitioner on the night of the incident and that, when he left her residence, he was wearing boots and a gray sweat suit. Trial counsel then explained to the Petitioner that they could not call Robinson because she would confirm that the Petitioner was wearing gray sweat pants. On cross-examination, trial counsel clarified that the Petitioner gave him Robinson's name prior to trial but did not give him a phone number until the trial. He could not recall whether he reviewed a videotaped statement by Robinson prior to trial.

When trial counsel spoke with the Petitioner's brother about testifying, the brother told trial counsel not to call him because the Petitioner would not "not like what [he would] have to say." Accordingly, trial counsel did not call the Petitioner's brother to testify, either.

According to trial counsel, the Petitioner maintained until trial that he was not present at the residence where the incident took place. However, during deliberations, he heard the Petitioner tell a reporter "that the biggest mistake he made was going to the house that night." At that point, trial counsel realized that the Petitioner really had no alibi. Trial counsel agreed that the Petitioner's dishonesty with trial counsel hampered trial counsel's ability to defend the Petitioner. The Petitioner had told trial counsel that a third party was involved in the incident who never was caught and actually performed "all the bad stuff." Then, at the sentencing hearing, the Petitioner stated that he had fabricated that person.

The Petitioner's mother had informed trial counsel about the Petitioner's educational background and learning disability. As a result, trial counsel was particularly careful to help the Petitioner understand what he explained to the Petitioner. He knew that the Petitioner understood because the Petitioner would later relay the information to "other people."

Trial counsel stated that he discussed with the Petitioner the DNA on the toboggan matching the Petitioner and the co-defendant. He specifically remembered discussing that they could highlight to the jury the fact that "the State couldn't prove that it was him or his brother. Just one or the other." Trial counsel was not aware of technology that could differentiate the DNA of identical twins.

Regarding his overall representation of the Petitioner, trial counsel stated that he gave the Petitioner's case "a lot of attention." Because the Petitioner had never indicated that he wanted to do anything but try the case, trial counsel "attacked this case from the beginning as being a case that was going to be tried."

On cross-examination, trial counsel believed that the State "probably" made a plea offer but could not remember the specifics of the offer. However, he stated that "if there was an offer on the table [the Petitioner] knew about it." He did not recall the name, Josh Blackner, or that this name was provided by the State with an attached statement. He also did not recall receiving a supplemental police report from the State notifying him of a cigar found at the scene. He recalled that the second toboggan and sweat shirt found had DNA not matching the Petitioner's DNA. He did not recall the DNA evidence revealing the presence of another person at the scene.

The post-conviction court denied the Petitioner relief, stating that the Petitioner failed to carry his burden of proof. The court stated, "I simply do not find your testimony credible

in any way based on my recollection of what took place at the trial as well as your presentation today."

In its written order, the post-conviction court accredited trial counsel's testimony that he discussed with the Petitioner "consecutive sentencing, the statutory requirement of 100% service of certain counts of the indictment, and the elements of the offense." It also accredited trial counsel's testimony that he showed the videotaped interview to the Petitioner using trial counsel's laptop at the jail. Although trial counsel could not recall whether he discussed with the Petitioner the community supervision for life requirement, the post-conviction court once again found the Petitioner's testimony not credible and, therefore, found that the Petitioner failed to establish by clear and convincing evidence that they did not discuss this requirement. Alternatively, the court found that the Petitioner failed to establish prejudice by proving that, but for trial counsel's failure, the Petitioner would have accepted the guilty plea instead of going to trial. The post-conviction court noted that the Petitioner did not present evidence that he was offered a plea or what the specifics of that plea were.

Regarding the Petitioner's allegations that trial counsel was deficient in not calling Taneisha Robinson or Josh Blattner as witnesses, the post-conviction court noted that neither of these individuals was called to testify at the evidentiary hearing. The court determined that the Petitioner failed to establish deficient performance on the part of trial counsel in this regard or resulting prejudice.

The post-conviction court next addressed the Petitioner's contention that trial counsel failed to support his motion to suppress with a memorandum "based on the Petitioner's alleged inability to comprehend procedures and proceedings." The court found that the Petitioner failed to "submit his academic record" or "call any witness to testify regarding his alleged inability" or his academic record.

Finally, as to the Petitioner's claims regarding DNA evidence, the post-conviction court found that, because the Petitioner failed to support these claims with any evidence other than his own testimony, the Petitioner failed to establish these allegations. Thus, the post-conviction court denied relief. The Petitioner timely appealed, alleging ineffective assistance of counsel.

## Analysis

### *Standard of Review*

Relief pursuant to a post-conviction proceeding is available only when the petitioner demonstrates that his or her "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of

the United States." Tenn. Code Ann. § 40-30-103 (2006). To prevail on a post-conviction claim of a constitutional violation, the petitioner must prove his or her allegations of fact by "clear and convincing evidence." Tenn. Code Ann. § 40-30-110(f) (2006). See Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). This Court will not overturn a post-conviction court's findings of fact unless the preponderance of the evidence is otherwise. Pylant v. State, 263 S.W.3d 854, 867 (Tenn. 2008); Sexton v. State, 151 S.W.3d 525, 531 (Tenn. Crim. App. 2004). We will defer to the post-conviction court's findings with respect to the witnesses' credibility, the weight and value of their testimony, and the resolution of factual issues presented by the evidence. Momon, 18 S.W.3d at 156. With respect to issues raising mixed questions of law and fact, however, including claims of ineffective assistance of counsel, our review is de novo with no presumption of correctness. See Pylant, 263 S.W.3d at 867-68; Sexton, 151 S.W.3d at 531.

*Ineffective Assistance of Counsel*

The Petitioner argues on appeal that he was denied effective assistance of counsel. The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel at trial.[3] Both the United States Supreme Court and the Tennessee Supreme Court have recognized that this right is to "reasonably effective" assistance, which is assistance that falls "within the range of competence demanded of attorneys in criminal cases." Strickland v. Washington, 466 U.S. 668, 687 (1984); see also Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). The deprivation of effective assistance of counsel at trial presents a claim cognizable under Tennessee's Post-Conviction Procedure Act. See Tenn. Code Ann. § 40-30-103; Pylant, 263 S.W.3d at 868.

In order to prevail on a claim of ineffective assistance of counsel, the petitioner must establish two prongs: (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense. See Strickland, 466 U.S. at 687; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The petitioner's failure to establish either prong is fatal to his or her claim of ineffective assistance of counsel. Goad, 938 S.W.2d at 370. Accordingly, if we determine that either prong is not satisfied, we need not consider the other prong. Id.

To establish the first prong of deficient performance, the petitioner must demonstrate that his lawyer's "acts or omissions were so serious as to fall below an objective standard of 'reasonableness under prevailing professional norms.'" Vaughn v. State, 202 S.W.3d 106,

---

[3] The Sixth Amendment right to counsel is applicable to the States through the Fourteenth Amendment to the United States Constitution. See Gideon v. Wainwright, 372 U.S. 335, 342 (1963); State v. Howell, 868 S.W.2d 238, 251 (Tenn. 1993).

116 (Tenn. 2006) (quoting Strickland, 466 U.S. at 688)). Our supreme court has explained that:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

Baxter, 523 S.W.2d at 934-35 (quoting Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974)). When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). Additionally, a reviewing court "must be highly deferential and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" State v. Honeycutt, 54 S.W.3d 762, 767 (Tenn. 2001) (quoting Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish a "reasonable probability that but for counsel's errors the result of the proceeding would have been different." Vaughn, 202 S.W.3d at 116 (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." Pylant, 263 S.W.3d at 869 (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)). "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of Strickland." Id.

The Petitioner first asserts that trial counsel failed to notify him adequately about the Petitioner's likelihood for consecutive sentencing or 100% service of his sentence. The post-conviction court, in its written order, accredited trial counsel's testimony that he discussed with the Petitioner "consecutive sentencing, the statutory requirement of 100% service of certain counts of the indictment, and the elements of the offense." Although the Petitioner

-10-

claimed at the post-conviction hearing that trial counsel failed to discuss these issues, we will defer to the post-conviction court's credibility findings in these matters. See Momon, 18 S.W.3d at 156. The Petitioner has failed to establish deficient performance on the part of trial counsel in this regard. Thus, we do not need to address the prejudice prong. See Goad, 938 S.W.2d at 370. Accordingly, the Petitioner is entitled to no relief on this basis.

Additionally, the Petitioner claims that he was not informed adequately about a plea offer from the State. In its order denying relief, the post-conviction court found that the Petitioner did not present evidence that he was offered a plea or what the specifics of that offer were. At the post-conviction hearing, the Petitioner did testify that trial counsel informed him of a twenty-three-year plea offer from the State but offered no other specifics. Trial counsel testified at the post-conviction hearing that the State "probably" made an offer, but trial counsel could not remember what it was. Trial counsel also stated that, if the State made an offer, the Petitioner would have known about it. The Petitioner has failed to prove this allegation of deficient performance by clear and convincing evidence. Moreover, as discussed in more detail below, the Petitioner never affirmatively testified that he would have accepted the plea offer had trial counsel's alleged deficiencies been remedied. Thus, the Petitioner is entitled to no relief on this issue.

Next, the Petitioner contends that trial counsel failed to inform him that the convictions for some of his indicted offenses carried a requirement for lifetime sex offender registry and community supervision for life. The post-conviction court once again found the Petitioner's testimony not credible and therefore found that the Petitioner failed to establish by clear and convincing evidence that they did not discuss this requirement. Alternatively, the court found that the Petitioner failed to establish prejudice by proving that, but for trial counsel's failure, the Petitioner would have accepted the guilty plea instead of going to trial.

Looking first to the prejudice prong, "[i]n the context of a petitioner who seeks to reinstate (rather than withdraw) a plea offer, the petitioner must show that there is a reasonable probability that he or she would have accepted the plea had it been properly communicated to him or her." State v. Garrison, 40 S.W.3d 426, 431 (Tenn. 2000).

Here, we will look at whether the Petitioner would have accepted the State's plea offer had trial counsel informed him of the community supervision for life or the sex offender registry requirement. The Petitioner did not testify that he would have accepted the plea offer had he been informed of the community supervision for life requirement. On cross-examination at the post-conviction hearing, the Petitioner did not state definitively that knowledge of the consecutive sentencing requirement would have caused him to accept the State's offer. Additionally, trial counsel testified that, because the Petitioner had never indicated that he wanted to do anything but try the case, trial counsel "attacked this case from the beginning as being a case that was going to be tried." Moreover, because we do not

-11-

know the specifics of the plea offer, we do not know whether the community supervision for life requirement would have been a component of the plea offer. The Petitioner has failed to establish that he was prejudiced in this regard. Therefore, we need not address the deficiency prong. See Goad, 938 S.W.2d at 370. Accordingly, the Petitioner is entitled to no relief on this issue.

The Petitioner also asserts that trial counsel was ineffective in failing to call two witnesses at trial: Taneisha Robinson and Josh Blattner. However, the Petitioner called neither of these alleged witnesses to testify at the post-conviction hearing. This Court has made clear that a claim of ineffective assistance of counsel arising from the failure to call a witness must be supported by testimony from the witness at the post-conviction hearing. See, e.g., Denton v. State, 945 S.W.2d 793, 802-03 (Tenn. Crim. App. 1996); Wade v. State, 914 S.W.2d 97, 102 (Tenn. Crim. App. 1995); Black v. State, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990); see also Pylant, 263 S.W.2d at 869. Without the alleged witnesses' testimony, there is no way for the post-conviction court (or this Court) to evaluate whether the absence of the testimony from trial had a prejudicial effect on the outcome. Accordingly, the Petitioner is entitled to no relief on this issue.

The Petitioner's next ineffective assistance claim is that trial counsel failed to provide a brief at the suppression hearing regarding the Petitioner's "inability to comprehend proceedings and procedures." The State, in response, avers that trial counsel was not ineffective because trial counsel presented evidence regarding the Petitioner's education at the suppression hearing. In denying the Petitioner relief, the post-conviction court found that the Petitioner failed to "submit his academic record" or "call any witness to testify regarding his alleged inability" or his academic record.

Turning to the deficiency prong, the Petitioner testified at the post-conviction hearing that he made available to trial counsel his academic record because of his learning disability as well as the names of people who could discuss it. However, to the Petitioner's knowledge, trial counsel never spoke with those individuals. He stated that he completed the twelfth grade and was enrolled in special education classes. Trial counsel testified that he believed the videotaped statement to be "a crucial part of the case," which was why he sought to have it suppressed. He recalled telling the Petitioner, however, that suppressing the video would be difficult "because the officers conducted it in such a friendly manner." Moreover, the Petitioner's mother had informed trial counsel about the Petitioner's educational background and learning disability. As a result, trial counsel was particularly careful to help the Petitioner understand what he explained to the Petitioner. He knew that the Petitioner understood because the Petitioner would later relay the information to "other people."

Once again, the evidence does not preponderate against the findings of the post-conviction court. The Petitioner has failed to establish deficient performance on the part of

trial counsel in this regard. Thus, we do not need to address the prejudice prong. See Goad, 938 S.W.2d at 370. Accordingly, the Petitioner is entitled to no relief on this basis.

The Petitioner also asserts that trial counsel failed to discuss with him "the importance of DNA evidence, the admissibility of DNA evidence, or the admissibility of DNA expert testimony." The State responds that it was the calculated decision of trial counsel not to question the validity of the DNA evidence because the evidence, which matched the DNA of either the Petitioner or the co-defendant, cast doubt on the Petitioner as the perpetrator. The post-conviction court found that, because the Petitioner failed to support these claims regarding DNA evidence with any evidence other than his own testimony, the Petitioner failed to establish these allegations.

Turning to the deficiency prong, the evidence does not preponderate against the post-conviction court's findings. At the post-conviction hearing, the Petitioner denied that trial counsel ever discussed with him a cigar found at the crime scene. On cross-examination, however, he could not explain the cigar's significance as to the case or this proceeding. He remembered that DNA evidence was presented at trial but stated that he never discussed the admissibility of such evidence with trial counsel prior to trial. He was unaware until after his conviction of other DNA evidence of which trial counsel was aware. The Petitioner recalled trial counsel filing a motion for new trial but did not know at what point trial counsel became aware of this DNA evidence. He denied discussing anything with trial counsel related to his motion for new trial.

On cross-examination, the Petitioner acknowledged that he was wearing a toboggan at the scene, but he did not believe the toboggan to be "good evidence" because the toboggan revealed the DNA of either the Petitioner or the co-defendant, given that they were twins. The Petitioner believed that a specialist could have analyzed the DNA to discern whose DNA was on the toboggan. He relayed the information about this purported specialist to trial counsel, but he stated that trial counsel did nothing with this information.

Trial counsel testified that he discussed with the Petitioner the DNA on the toboggan matching the Petitioner and the co-defendant. He specifically remembered discussing that they could highlight to the jury the fact that "the State couldn't prove that it was him or his brother. Just one or the other." Trial counsel was not aware of technology that could differentiate the DNA of identical twins.

At the conclusion of the post-conviction hearing, the post-conviction court found the Petitioner's testimony wholly lacking credibility. Once again, we will defer to the post-conviction court's credibility findings in these matters. See Momon, 18 S.W.3d at 156. The Petitioner has failed to establish deficient performance on the part of trial counsel in this

-13-

regard. Thus, we need not address the prejudice prong. See Goad, 938 S.W.2d at 370. Accordingly, the Petitioner is entitled to no relief on this basis.

Lastly, the Petitioner contends that the post-conviction court should have applied the cumulative error doctrine. Furthermore, the Petitioner avers that, "had the post-conviction court applied a cumulative error doctrine analysis, the accumulated analysis would be conclusive of ineffective counsel and subsequently, deprivation of a fair trial." However, "[o]ur Court has previously noted that a Petitioner who has failed to show that he received constitutionally deficient representation on any single issue may not successfully claim that his constitutional right to counsel was violated by the cumulative effect of counsel's errors." Tracy F. Leonard v. State, No. M2006-00654-CCA-R3-PC, 2007 WL 1946662, at *21 (Tenn. Crim. App. July 5, 2007), perm. app. denied (Tenn. Sept. 13, 2007) (citing Leon J. Robins v. State, No. M2005-01204-CCA-R3-PC, 2006 WL 1816361, at *20 (Tenn. Crim. App. June 27, 2006), perm app. denied (Tenn. Oct. 30, 2006); Antonio Jackson v. State, No. W2004-00328-CCA-R3-PC, 2005 WL 729147, at *4 (Tenn. Crim. App. Mar, 29, 2005), perm. app. denied (Tenn. Aug. 29, 2005); Terry Proffitt v. State, No. E2003-00250-CCA-R3-PC, 2004 WL 50797, at *3 (Tenn. Crim. App. Jan. 12, 2004), perm. app. denied (Tenn. June 1, 2004)). Accordingly, the Petitioner is entitled to no relief on his ineffective assistance of counsel claim.

## CONCLUSION

For the foregoing reasons, the Petitioner has failed to establish that he is entitled to post-conviction relief. Therefore, we affirm the judgment of the post-conviction court denying relief.

_____
JEFFREY S. BIVINS, JUDGE